# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

|                                                    |   |                                            |
|----------------------------------------------------|---|--------------------------------------------|
| KATHALEEN BARNETT,                                 | : |                                            |
|                                                    |   |                                            |
|     Plaintiff,                 | : |                                            |
|                                                    |   | Case No. 3:08cv00259                       |
|  vs.                                          | : |                                            |
|                                                    |   | District Judge Thomas M. Rose              |
| MICHAEL J. ASTRUE,                                 | : | Magistrate Judge Sharon L. Ovington        |
| Commissioner of the Social                         |   |                                            |
| Security Administration,                           | : |                                            |
|                                                    |   |                                            |
|     Defendant.                 | : |                                            |

## REPORT AND RECOMMENDATIONS[1]

## I.      INTRODUCTION

Plaintiff Kathaleen Barnett applied with the Social Security Administration for Disability Insurance Benefits (DIB) asserting that she was unable to work because of numerous health problems, including recurring migraines, recurring diarrhea, high blood pressure, bilateral carpal tunnel syndrome, arthritis in her knees and back, diabetes, asthma and a "mini" stroke. (Tr. 56A-56C, 58). The Social Security Administration denied Plaintiff's DIB application, mainly through the written decision of Administrative Law Judge (ALJ) Thomas R. McNichols, II, who concluded that Plaintiff's health problems did not constitute a "disability" as defined by the Social Security Act. (Tr. 15-30).

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

There is no dispute in the present case that this Court has jurisdiction to review ALJ McNichols' decision. *See* 42 U.S.C. §405(g).

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #10-2), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record, and the record as a whole.

Plaintiff seeks an Order remanding, at a minimum, this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.     BACKGROUND

### A.     <u>Plaintiff and Her Testimony</u>

Plaintiff's was 52 years old at the time of ALJ McNichols' decision and was thus considered a person "closely approaching advanced age" for purposes of resolving her DIB application. *See* 20 C.F.R. §404.1563(d); *see also* Tr. 30. She has a 9th grade education. Over the years she has worked as a machine cutter, hand cutter, pet shop attendant, cashier, and fast food worker. (Tr. 29, 59, 68).

Plaintiff asserted in her DIB application that she was under a disability beginning on October 1, 2003 and thereafter.

During the ALJ's hearing, Plaintiff testified that she stopped working full time when her company closed. (Tr. 528). She also explained that she was losing concentration and was afraid that she would get hurt on the job. Despite this, her employer asked her to stay until the company closed, and she did. *Id.*

Plaintiff also testified that she suffered from high blood pressure; arthritis in her knees, back, and feet; a cyst on her right foot; asthma; diabetes with neuropathy in both legs; and depression with suicidal thoughts. (Tr. 528-33). She stated that she attempted to commit suicide once. She had never been hospitalized for psychological problems. (Tr. 533-34). And she had difficulties with irritability. Plaintiff and her husband "stay at

home all the time because I don't want to go out.  We don't have any friends or anything." (Tr. 534).

At the time of the ALJ's hearing, Plaintiff had been in psychological counseling for slightly longer than one year, which helped her.  Medication helped reduce the severity of her nightmares.  (Tr. 534).

When asked how depression affected her ability to work, Plaintiff answered, "people wouldn't like me because I'd be down all the time...."  (Tr. 535).  Plaintiff also understood that a person cannot do a good job if he or she is not in a good mood.  *Id*.

Plaintiff had also been told that she suffers from bipolar disorder, which causes her to lose concentration.  *Id*.  She had mood swings:  "[O]ne minute I'll be in a good mood, then all of a sudden I'm either crying or hollering."  *Id*.

As to her daily activities, Plaintiff did minimal cooking (only breakfast).  She did not wash dishes.  She did not sweep, vacuum, or mop because it would hurt her back and legs.  (Tr. 542-43).  She did not wash clothes, go shopping, go to church, visit friends, or go to the movies.  (Tr. 543).  She occasionally visited her sister.  She had no hobbies.  She could feed, dress, and groom herself.  (Tr. 545).  She helped take her eight and nine year old grandchildren to school, but her husband helped them get ready.  (Tr. 545-46).  When asked how she spends the rest of her day, Plaintiff testified, "Sit and stare out the window."  (Tr. 546).  If it was warm enough outside, she would sit on the porch.  *Id*.

### B.    Additional Evidence

Plaintiff does not challenge the ALJ's findings with respect to her physical impairments or abilities.  As a result, the significant medical evidence in this case concerns her mental health.

**Jaseem Pasha, M.D.**    Psychiatrist Dr. Pasha initially evaluated Plaintiff in July 2004.  (Tr. 367-70).  Plaintiff reported racing thoughts, insomnia and depression.  On mental status examination, Dr. Pasha noted that Plaintiff's speech was rapid, and she

seemed agitated. (Tr. 368). Her mood was depressed and anxious, and her affect was full. Dr. Pasha diagnosed a bipolar disorder, depressed type, and panic disorder without agoraphobia. (Tr. 369). He assigned a GAF of 55. *Id.* Dr. Pasha began Plaintiff on Celexa and Klonopin.

On August 5, 2004, Dr. Pasha noted some improvement with medication. Plaintiff had fewer mood swings with Klonopin, she was sleeping well with no nightmares, and her panic attacks were less frequent. (Tr. 366). Plaintiff reported no side effects. *Id.*

On September 9, 2004, Plaintiff reported dizziness when she got up too quickly and felt it was because of the Klonopin. Her "panic attacks have decreased considerably." (Tr. 364-65). Xanax made her feel more "leveled." *Id.* In October 2004 Plaintiff continued to report dizziness. (Tr. 349-50). By November 4, 2004, she reported that she was down to about 2 panic attacks per week instead of 4 to 5 panic attacks, and her mood swings were reduced. (Tr. 347-48). On December 16, 2004, Dr. Pasha noted that Plaintiff's dizzy spells were gone and her panic attacks are less than before; she was anxious and her mind raced at nights, but she was not suicidal. (Tr. 345-46).

Dr. Pasha responded to interrogatories on March 3, 2005 (Tr. 437-45), reporting that Plaintiff was being treated for Bipolar Disorder, depressed type, and Panic Disorder with multiple physical problems. (Tr. 438). Dr. Pasha reported that Plaintiff's psychiatric illness had an adverse impact not only on her mental status and daily functioning but also aggravated her physical problems – especially diabetes, migraines, and asthma. (Tr. 439). Dr. Pasha further explained:

> On the other hand, her multiple system disease not only adversely impact her physical states but also aggravates her Panic Disorder and depressive component of her Bipolar Disorder, thus the resultant impairment is greater than the sum of physical and mental impairments.

(Tr. 439).

Dr. Pasha opined that Plaintiff could not be prompt and regular in work attendance due to her impaired concentration, memory, predictability, consistency, and poor attention

span.  These impairments, according to Dr. Pasha, were due to the "combined effect of Plaintiff's physical and mental conditions."  (Tr. 440).  Dr. Pasha further believed that Plaintiff was unable to perform in any area of mental work activities for these same reasons.  (Tr. 440-445).

In April 2005 Plaintiff felt that Abilify was helping her mood swings but she was living with her sister because her husband was "fed up" with her mood swings.  (Tr. 450-51).  In June 2005 Plaintiff reported having "vivid dreams" about 3 to 4 times per week.  She also reported sleeping 18 hours a day, and she continued to have panic attacks about 3 times a month. (Tr. 448-49).  In September 2005 she felt her "vivid dreams" were reduced, and her mood swings happened less frequently.  Dr. Pasha indicated he might increase Abilify if her mood swings were not decreasing.  (Tr. 446-47).

In December 2005 Plaintiff reported that her mood swings were still there although were much less.  Plaintiff's affect was blunt on mental status examination.  (Tr. 450-51).  In January 2006 Plaintiff reported that her mood swings were not "too bad." (Tr. 457-58).

**Victor Stanchina, M.A.:**  Plaintiff was initially evaluated by Victor Stanchina, MA, on April 1, 2004.  (Tr. 357-63, 428).  Mr. Stanchina notes that he is an "Ohio License Psychologist – 35 years clinical experience."  (Tr. 428).  He treated Plaintiff from April 1, 2004 to at least December 30, 2004.  *Id.*

Mr. Stanchina's notes indicate that Plaintiff reported childhood sexual abuse by her father.  Her brother ultimately shot and killed her father, then committed suicide.  (Tr. 356).  Plaintiff also reported a history of mild panic attacks and longstanding depression. (Tr. 358).  Mental status examination revealed that her mood was moderately depressed and her affect was within normal limits.  She was anxious, although cooperative, on examination.  (Tr. 359).  She was diagnosed with a bipolar disorder (depressed), panic disorder, post-traumatic stress disorder, and personality disorder, not-otherwise-specified. Plaintiff was assigned a global assessment of functioning of 55 (Tr. 363), referring generally to a person with "moderate symptoms ... or moderate difficulty in social,

occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."[2] <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision at p. 34 (DSM-IV-TR). Mr. Stanchina recommended outpatient therapy and psychiatric treatment for help in stabilizing moods. (Tr. 371).

On May 7, 2004, Mr. Stanchina reported to the Ohio Bureau of Disability Determination that Plaintiff's mood was depressed and her affect was flat. (Tr. 319-21). He noted Plaintiff continued to have panic attacks. He described her concentration and memory as poor. (Tr. 319). Mr. Stanchina opined that Plaintiff had a poor ability to remember, understand, and follow directions; maintain attention; or sustain concentration, persist at tasks, and complete them in a timely fashion. Mr. Stanchina further opined that Plaintiff had poor social adaptation and a very low stress tolerance. (Tr. 320).

On January 6, 2006, Mr. Stanchina answered written interrogatories (Tr. 428-36) that Plaintiff was under treatment for bipolar disorder with depression, panic attacks, and post-traumatic stress disorder. (Tr. 429). Mr. Stanchina checked an answer indicating his belief that the combined effects of Plaintiff's physical and mental impairments cause her greater limitations than her physicial impairments alone. *Id*. He explained that Plaintiff's personality make up affected her ability to cope with pain and physical limitations. (Tr. 430). He noted that she was easily upset by minor stresses. And he further noted that Plaintiff tended to be pessimistic, and her depression and anxiety exacerbated this and decreased her ability to deal with pain. (Tr. 430).

Mr. Stanchina did not think that Plaintiff could be prompt and regular in attendance due to the fact that her moods varied significantly; she had very limited coping abilities for managing stress or pressure of work productivity standards; her depression

---

[2] Global Assessment Functioning (GAF) is a tool used by health-care professionals to assess a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness. It is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* DSM-IV-TR at pp. 32-34.

limited her attention span and ability to concentrate such that her work productivity would be low; and she would need close supervision because she became easily confused and overwhelmed. (Tr. 432). Mr. Stanchina did not think that Plaintiff could behave in an emotionally stable manner because her mood swings varied greatly: "At times, she is optimistic, and suddenly [her] mood changes to extreme irritability, pessimism." (Tr. 433). He felt that Plaintiff was "very limited as far as her ability to deal with routine stressors – i.e. job requirements." (Tr. 434). And Mr. Stanchina concluded that Plaintiff could not handle the mental demands of a work on a regular and continuing basis. (Tr. 431-36).

In March 2005 Mr. Stanchina noted that Plaintiff's mood was slightly improved. (Tr. 473). He also reported that Plaintiff had made "significant improvement in her reduction of depression since she began in treatment." *Id.* In June, August, and December 2005, Mr. Stanchina noted improvement in Plaintiff's moods. (Tr. 466-70).

**J. William McIntosh, Ph.D.** Dr. McIntosh performed a one-time psychological evaluation of Plaintiff on January 14, 2004. (Tr. 285-89). Dr. McIntosh's evaluation and resulting opinions pre-date the treatment and opinions provided by Dr. Pasha and Mr. Stanchina. Consequently, Dr. McIntosh did not have the benefit of Dr. Pasha's March 3, 2005 opinions, and he did not have any of the information provided by Mr. Stanchina.

Dr. McIntosh noted that although Plaintiff reported taking Xanax and Prozac, she did "not have the prescriptions filled at the present time." (Tr. 285). She enjoyed reading the newspaper. *Id.* Dr. McIntosh observed that Plaintiff presented her "problems in an almost never-ending fashion." *Id.* When asked why she couldn't work, Plaintiff responded, "I have mood swings and fly off the handle. I get paranoid about people coming up behind me. I prefer to be left alone, especially by males. I don't like rules." (Tr. 286). Plaintiff also reported an episode of "blacking out" after surgery the previous August, and ending up driving to Tennessee with no memory of how she got there. *Id.*

On mental status examination, Plaintiff's memory for recent and remote events seemed good although she only recalled two of three objects after five minutes.  Plaintiff reported that she misplaced or forgot things at times, and has even forgotten to pick up her granddaughter from school.  Plaintiff stated she had problems with concentration and was easily distracted by her own thoughts.  Her husband did not think she should drive because of distraction.  Dr. McIntosh felt that Plaintiff had "very poor insight into her need to feel ill. Her judgment seems moderately impaired due to her misperceptions and over reporting of difficulties."  (Tr. 287).

Dr. McIntosh diagnosed a somatization disorder and histrionic traits and assigned a GAF of 62 (Tr. 288), generally indicating a person with "[s]ome mild symptoms ... or moderate difficulty in social, occupational, or school functioning ... but generally functioning pretty well...."  DSM-IV-TR at p. 34.

Dr. McIntosh opined that Plaintiff's ability to remember and carry out 1- or 2-step job instructions did not appeared to be impaired; she should be able to interact minimally well with supervisors and coworkers; her ability to withstand the stress and pressure of day-to-day work activity was moderately limited.   (Tr. 288).  According to Dr. McIntosh, Plaintiff would be likely to "translate her stresses into further physical complaints."  *Id.* Dr. McIntosh also found that Plaintiff's ability to concentrate and attend to simple, repetitive tasks – like cooking breakfast – was "fairly good."  (Tr. 288-89).

**Caroline T. Lewin, Ph.D.**  Dr. Lewin, a psychologist for the Ohio BDD, reviewed the record on February 23, 2004.  (Tr. 302-18).  She opined that Plaintiff had the mental impairment of somatoform disorder with a moderate limitation in her activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  (Tr. 313).  Dr. Lewin also believed that Plaintiff was either moderately limited or not significantly limited in the majority of her mental work abilities.  (Tr. 316-17).  Dr. Lewin explained in part that she

agreed with the examining source opinion, presumably Dr. McIntosh's opinions, and weighted them "heavily." (Tr. 318).

**Bruce J. Goldsmith, Ph.D.** On July 1, 2004, Dr. Goldsmith, a record-reviewing psychologist, found that Plaintiff's allegations were in excess of objective findings. (Tr. 324-38). Dr. Goldsmith noted that Mr. Stanchina's report[3] of poor attention, concentration, and memory were inconsistent with the objective findings at Plaintiff's physical and psychological consultative evaluations. (Tr. 338). Dr. Goldsmith further noted that Mr. Stanchina did not submit any progress notes or evaluation reports to substantiate his conclusions. *Id.* According to Dr. Goldsmith, Plaintiff could concentrate adequately for serial tasks, could relate to others, and could adapt to changes. *Id.* And Dr. Goldsmith found that Plaintiff was able to perform basic 1- to 2-step tasks with routine expectations and normal work production requirements. *Id.*

III. **THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW**

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a

---

[3] Referred to by Dr. Goldsmith as "t/s report," meaning treating source report. (Tr. 338).

specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 14-15; *see also* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.   Has the claimant engaged in substantial gainful activity?

2.   Does the claimant suffer from one or more severe impairments?

3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.   Considering the claimant's residual functional capacity,[4] can the claimant perform his or her past relevant work?

5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

## IV.   THE ALJ's DECISION

At Step 1 of the sequential evaluation, the ALJ found that Plaintiff met the

---

[4]   The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

insured-status requirement for DIB eligibility through December 2008. (Tr. 29). The ALJ also found at Step 1 that Plaintiff had not engaged in substantial gainful activity since her claimed disability onset date of October 1, 2003.

The ALJ found at Step 2 that Plaintiff had the severe impairments of intermittent back, right knee, and right thumb pain attributed to early arthritis; asthma, diabetes, obesity, bipolar disorder (depressed type), and panic disorder.

The ALJ determined at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled the level of severity described in the Listings. *Id.*

At Step 4 the ALJ found that Plaintiff was able to perform the basic exertional requirements of light work,[5] if she was:

> (1) limited to frequent stair climbing and balancing; (2) limited to occasional stooping, kneeling, crouching, and crawling; (3) restricted from ladder, rope, and scaffold climbing; (4) restricted from exposure to hazards and pulmonary irritants; (5) restricted from work on uneven surfaces; (6) restricted from work involving contact with the general public; (7) limited to low stress jobs (no production quotas); and (8) limited to simple, one-or two-step tasks (requiring little, if any, concentration).

(Tr. 29). The ALJ further found that Plaintiff was unable to perform her past relevant work.

At Step 5 the ALJ determined that a significant number of jobs existed in the national economy that Plaintiff could perform. (Tr. 30). This determination, along with the ALJ's findings throughout his sequential evaluation, led him to ultimately conclude that Plaintiff was not under a disability and hence not eligible for DIB. (Tr. 29-30).

## V. JUDICIAL REVIEW

Judicial review determines whether substantial evidence in the administrative

---

[5] Under the Regulations, "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...." 20 C.F.R. §404.1567(b).

record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance...'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review for substantial evidence is deferential not *de novo. See Cruse v. Commissioner of Social Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). An ALJ's factual findings must be upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Once substantial supporting evidence is found in the administrative record, courts do not consider whether they agree or disagree with the ALJ's findings or whether the administrative record contains contrary evidence. *Rogers*, 486 F.3d at 241; *see Her*, 203 F.3d at 389-90.

Substantial evidence is not the analytical ending point. Judicial review further considers whether the ALJ "applied the correct legal criteria." *Bowen*, 478 F.3d at 746. If the ALJ does not, the decision may not be upheld even if the findings are supported by substantial evidence. *See id.* For example, a decision will not be upheld where the ALJ failed to apply mandatory procedural rules and standards established by the Commissioner's Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See id.* (and cases cited therein).

## VI.     DISCUSSION

### A.     <u>The Parties' Contentions</u>

Plaintiff contends that the ALJ erred by rejecting the opinions of Dr. Pasha and Mr. Stanchina based on their notes of improvement in Plaintiff's condition in late 2005

and early 2006. Plaintiff reasons that even if it is assumed *arguendo* that her condition had improved by then, the ALJ erred because his decision is "absolutely silent as to the applicability of the opinions of the treating sources from April 2004 through late 2005." (Doc. #10-2 at 14).

Plaintiff further contends that even with improvement in her condition, she still had problems handling stress due to the combined impact of her mental and physical impairments, as both Dr Pasha and Mr. Stanchina indicated. Plaintiff thus contends that the ALJ erred by paying little attention to the interplay between her mental and physical impairments.

Plaintiff also contends that the ALJ's limitation to low stress work did not adequately account for her limited ability to handle work stress, as Mr. Stanchina recognized.

Lastly, Plaintiff maintains that the ALJ erred by failing to discuss the weight he placed on the non-treating medical sources' opinions, particularly consultative examiner, Dr. McIntosh, and the state agency reviewing psychologists, Drs. Lewin and Goldsmith. Plaintiff emphasizes that these medical sources had none of her treatment records available to review.

The Commissioner contends that substantial evidence supports the ALJ's assessment of Plaintiff's Residual Functional Capacity. The Commissioner argues that the ALJ reasonably rejected the extreme opinions of Dr. Pasha and Mr. Stanchina because their opinions were not consistent with the record, particularly with respect to Plaintiff's treatment and activity. The Commissioner, moreover, rejects each of Plaintiff's contentions (for various reasons) and asserts that in light of Plaintiff's Residual Functional Capacity for light work, with mental limitations supported by the record, she was not under a disability because there were thousands of jobs available in the national economy she could perform.

### B.    Medical Source Opinions

### 1.
### Treating Medical Sources

Key among the standards to which an ALJ must adhere is the principle that greater
deference is generally given to the opinions of treating medical sources than to the
opinions of a non-treating medical source.  *Rogers v. Commissioner of Social Sec.*, 486
F.3d 234, 242 (6th Cir. 2007); *see* 20 C.F.R. §404.1527(d)(2).  This is so, the Regulations
explain, "since these sources are likely to be the medical professionals most able to
provide a detailed, longitudinal picture of [a DIB claimant's] medical impairment(s) and
may bring a unique perspective to the medical evidence that cannot be obtained from the
objective medical findings alone or from reports of individual examiners, such as
consultative examinations or brief hospitalizations...."  20 C.F.R. §404.1527(d)(2); *see
also Rogers*, 486 F.3d at 242.  In light of this, an ALJ must apply controlling weight to a
treating source's opinion when it is both well supported by medically acceptable data and
not inconsistent with other substantial evidence of record.  *Rogers*, 486 F.3d at 242; *see
Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also*
§404.1527(d)(2).

If either of these attributes is missing, the treating source's opinion is not
deferentially due controlling weight, *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.3d at
544, but the ALJ's analysis does not end there.  Instead, the Regulations create a further
mandatory task for the ALJ:

> Adjudicators must remember that a finding that a treating source
> medical opinion is not well-supported by medically acceptable [data] ... or
> is inconsistent with other substantial evidence in the case record means only
> that the opinion is not entitled to 'controlling weight,' not that the opinion
> should be rejected.....

Social Security Ruling 96-2p, 1996 WL 374188 at *4.  The Regulations require the ALJ
to continuing the evaluation of the treating source's opinions by considering "a host of

other factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

"[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician [or psychologist] is entitled to great deference, its non-controlling status notwithstanding." *Rogers*, 486 F.3d at 242.

## 2.
## Non-Treating Medical Sources

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id.* at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(f); *see also* Ruling 96-6p at *2-*3.

## C.    Analysis

The ALJ correctly described the legal criteria applicable to evaluating the opinions of Dr. Pasha and Mr. Stanchina. *See* Tr. 25-26; *see also* 20 C.F.R. §404.152(d)(2)-(5). In doing so, the ALJ did not err as a matter of law. *See Rogers*, 486 F.3d at 242; *see also Wilson*, 378 F.3d at 544.

The ALJ explained his evaluation of these medical sources' opinions as follows:

The opinions of Dr. Pasha and Mr. Stanchina are not found to be consistent with the evidence of record as it pertains to the claimant's treatment and activity. Dr. Pasha's treatment notes reflect improvement on medication to the point where, in late 2005 and early 2006, the claimant was doing okay, denied panic attacks, had a more stable mood, and denied any suicidal ideation. Mr. Stanchina noted in late 2005 that the claimant's suicidal thoughts had stopped; her mood swings were less frequent; and she was engaging in leisure activity of fishing. The claimant reported that she was able to perform simple household chores regularly without reported difficulty with concentration or persistence to task completion.

(Tr. 26).

The problem with this evaluation is that it is based on the ALJ's own lay medical interpretation of Dr. Pasha's treatment notes and Mr. Stanchina's treatment notes. Although it was not error for the ALJ to consider the consistency of these treating sources' opinions, the ALJ essentially disagreed with Dr. Pasha and Mr. Stanchina about the significance of these improved symptoms without relying on anything but his own lay opinion. This constituted error, especially as to Dr. Pasha who detailed his reasons for the opinions he expressed, *see* Tr. 438-40, which the ALJ ignored or overlooked when evaluating his opinions, *see* Tr. 26. "[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see Meece v. Barnhart*, 2006 WL 2271336, *8 (6th Cir. 2006)("the ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2nd Cir. 1999)("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion."); *Hamlin v. Barnhart*, 365 F.3d 1208, 1217 (10th Cir. 2004)(ALJ improperly rejected treating physician's opinion "because of the ALJ's own credibility judgments, speculation or lay opinion."); *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir. 1996)("the ALJ clearly overstepped his bounds when he substituted his medical judgment for that of Dr. Spray..."); *Balsamo v. Chater*, 142 F.3d 75, 81 (2nd Cir. 1998)("In the absence of a

medical opinion to support the ALJ's finding as to Balsamo's ability to perform sedentary work, it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.... [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." (internal citation omitted)); *Gonzalez v. Apfel*, 113 F.Supp.2d 580, 590 (S.D.N.Y. 2000) (same).

In addition, the ALJ's evaluation of the opinions provided by Dr. Pasha and Mr. Stanchina case contains a similar problem to the error discussed in *Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008). In *Bauer* the Court of Appeals for the Seventh Circuit concluded that the ALJ lacked an acquaintance with bipolar disorder by emphasizing the treatment notes containing "a number of hopeful remarks. They are either remarks the plaintiff made to Caspary [her treating psychiatrist] during office visits or Caspary's independent observations – the plaintiff's memory was 'ok,' her sleep fair, she was doing 'fairly well,' her 'reported level of function was found to have improved,' she had a 'brighter affect and increased energy,' and she 'was doing quite well.' On the basis of such remarks the administrative law judge concluded: 'little weight is given to the assessment of Dr. Caspary.'" *Bauer*, 532 F.3d at 609. In the instant case, the ALJ took a similarly flawed approach to the treating medical source opinions, *see* Tr. 26, thus tending to show a misunderstanding of the fluctuating nature of bipolar disorder generally,[6] and Plaintiff's bipolar particularly. *See, e.g,* Tr. 429 ("Kathaleen's moods vary significantly") Tr. 433 ("Kathaleen's moods vary greatly. At times, she is optimistic, and suddenly [her] mood changes with extreme irritability, pessimism.").

As the Court in *Bauer* explained:

> A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have

---

[6] *See* <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 4th ed., Text Revision at pp. 392-97.

better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job. E.g., *Watson v. Barnhart,* 288 F.3d 212, 217-18 (5th Cir. 2002); *Washington v. Shalala,* 37 F.3d 1437, 1442-43 (10th Cir. 1994). That is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment. Ronald C. Kessler et al., 'The Prevalence and Effects of Mood Disorders on Work Performance in a Nationally Representative Sample of U.S. Workers,' 163 *Am. J. Psychiatry* 1561-68 (2006).[7] That is another point that the administrative law judge overlooked.

*Bauer*, 532 F.3d at 609 (footnote added).

Plaintiff correctly points out that the ALJ did not discuss the weight he was giving to any other medical source of record when assessing her mental work abilities and limitations. *See* Tr. 26. Indeed, there is no mention of the state agency medical reviewers or Dr. McIntosh's opinions in the ALJ's assessment of Plaintiff's Residual Functional Capacity for mental work activities. *See id.* If it is assumed the ALJ relied on those medical sources in support of his assessment of Plaintiff's Residual Functional Capacity, the Regulations required the ALJ to weigh their opinions under the factors of, at least, supportability, consistency, and specialization. *See* 20 C.F.R. §404.1527(d), (f). The Commissioner reminds, speaking through a Ruling:

> The Regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.
>
> For this reason, the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the

---

[7] This article is also available at the National Institute of Health's website. http://www.pubmedcentral.nih.gov.

case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Councils levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other facts that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

Social Security Ruling 96-6p, 1996 WL 374180 at *2.

The Commissioner's Regulations mandate ALJs to provide meaningful explanations for the weight given to non-examining state agency physicians or psychologists, stating: "Unless the treating physician's opinion is given controlling weight, the administrative law judge <u>must explain</u> in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R. §404.1527(f)(2)(ii) (emphasis added). The ALJ erred by not complying with this Regulation when assessing Plaintiff's Residual Functional Capacity for mental work activities. *See* Tr. 26

There remains the possibility that the ALJ's errors were harmless. *See Bowen*, 478 F.3d at 747-49. A review of the opinions provided by Dr. Pasha and Mr. Stanchina reveals that they supported their opinions with explanations, thus providing at least one regulatory reason for crediting their opinions. *See supra*, §II(B) (and records cited therein); *see also* §404.1527(d)(2)-(3). Consequently, their opinions were not so patently deficient that they could not be credited, *see Wilson*, 378 F.3d at 547, and this is not the "rare case"[8] in which a violation of 20 C.F.R. 404.1527(d)(2) can be deemed harmless.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.

---

[8] *Bowen*, 478 F.3d at 748.

## D.    Remand Is Warranted

If the ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of  42 U.S.C. §405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and because the evidence of a disability is not strong while contrary evidence is weak.  *See Faucher*, 17 F.3d at 176.

Plaintiff, however, is entitled to an Order remanding this case to the Social Security Administration pursuant to Sentence Four of §405(g) due to problems set forth above.  On remand, the ALJ should be directed to (1) re-evaluate the medical source opinions of record under the legal criteria applicable under the Commissioner's Regulation and Rulings and as mandated by case law; and (2) review Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and thus eligible for DIB.

Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff Kathaleen was under a "disability" within the meaning of the Social Security Act;

3.    This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. §405(g) for further consideration consistent with this Report; and

4.    The case be terminated on the docket of this Court.


July 15, 2009

                                    s/Sharon L. Ovington
                                    Sharon L. Ovington
                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Am,* 474 U.S. 140 (1985).